IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| VANESSA BERTRAND<br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>    Defendants. | **COMPLAINT FOR DAMAGES**<br><br>**Civil Action No.:** |

## COMPLAINT FOR DAMAGES

Plaintiff VANESSA BERTRAND, by and through undersigned counsel, upon information and belief at all times hereinafter mentioned, alleges as follows,

## STATEMENT OF JURISDICTION

1. Plaintiff VANESSA BERTRAND is an adult citizen of the state of Georgia, who currently resides at 3813 Willow Tree Circle, Douglasville, Douglas County, Georgia 30135.

2. BORINQUEN HEALTH CARE CENTER, INC. (hereinafter, "BHCC") is a federally deemed community health center in Miami, Florida. BHCC owns and operates the medical facility located at 100 NE 38th Street, Miami, Florida 33137.

3. BHCC is a federally deemed community health center pursuant to 28 U.S.C. §§ 2401(b), 2675(a). Therefore, the UNITED STATES OF AMERICA is a necessary party to this action, and may be served by sending a copy of the Summons and Complaint by registered or certified mail to the following: (a) Civil Process Clerk - United States Attorney for the Northern District of Georgia; United States Attorney's Office; Richard B. Russell Federal Building; 75 Ted Turner Drive SW, Suite 600, Atlanta, Georgia 30303; (b) Attorney General of the United States; U.S. Department of Justice; 950 Pennsylvania Avenue, NW; Washington, D.C. 20530; and (c) U.S. Department of Health and Human Services; Office of the General Counsel, General Law Division; 330 C. Street, SW; Switzer Building – Suite 2600; Washington, D.C. 20201.

4. Nancy Navarro-Gonzalez, M.D. is a physician licensed provisionally in the state of Florida. At all times relevant hereto, Defendant Nancy Navarro-Gonzalez, M.D. was an employee and agent of Defendant United States of America, through BHCC, and was acting within the scope of her employment and agency with Defendant United States of America. Therefore, Defendant United States of America is liable for the negligent acts and omissions of Nancy Navarro-Gonzalez, M.D. under the principles of *respondeat superior* and other principles of agency and principle law.

5. This Court has original jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1346(b). This Court has original jurisdiction over the Defendant in this case pursuant to 28 U.S.C. § 1346(b). Venue is proper in this Court pursuant to 32 C.F.R. 750.32, because Plaintiff resides in Douglas County, Georgia, which is located in the Atlanta Division of the Northern District of Georgia.

## PRE-SUIT ADMINISTRATIVE PROCEDURE

6. On or around June 23, 2016, Vanessa Bertrand sent a Statement Form 95 and all supplemental materials to the U.S. Department of Health and Human Services, the appropriate federal agency, in accordance with 42 U.S.C. § 254b.

7. The Statement Form 95 was received by the U.S. Department of Health and Human Services on or around July 6, 2016. At that time, additional materials and/or additional copies were requested of Ms. Bertrand, through her counsel. Counsel provided all requested documents and copies.

8. Between July 6, 2016 and March 22, 2017, the U.S. Department of Health and Human Services reviewed Ms. Bertrand's administrative tort claim and discussed a possible resolution of the claim with Ms. Bertrand through her counsel. A resolution was not reached.

9. On or around March 22, 2017, the U.S. Department of Health and Human Services contacted Ms. Bertrand, through her counsel, and authorized Ms. Bertrand to "file suit against the United States in the appropriate federal district court within six (6) months from the date of mailing of this determination."

## STATMENT OF CLAIM

10. On February 24, 2015 Vanessa Bertrand presented to BHCC for a psychiatric evaluation, and was evaluated by Ernesto Matos-Gonzalez.

11. On February 24, 2015, after an evaluation of Ms. Bertrand. Dr. Matos-Gonzalez diagnosed Ms. Bertrand with adult Attention Deficit Hyperactivity Disorder ("ADHD") and prescribed Ms. Bertrand Adderall XR 20 mg (1 per day).

12. On March 25, 2015, Ms. Bertrand returned to BHCC for a follow-up

visit and medication management with Dr. Matos-Gonzalez. On this date, Ms. Bertrand mentioned to Dr. Matos-Gonzalez that she had previously been evaluated by a neurological psychologist who recommended that she undergo an evaluation for Bipolar Disorder.

13. In response to Ms. Bertrand's comment that she had previously been recommended for a Bipolar Disorder evaluation, Dr. Matos-Gonzalez documented in the medical record for Ms. Bertrand, "I told [Ms. Bertrand] that I did not diagnose her with bipolar ... no such [symptoms] of depression or mania-hypomania were part of her [complaints] when I did her psychiatric examination, additionally there were no objective signs of depression or mania."

14. Dr. Matos-Gonzalez did not diagnose Ms. Bertrand with Bipolar Disorder, and her diagnosis remained Adult ADHD.

15. On April 20, 2015, Ms. Bertrand presented to BHCC for a follow-up appointment for the purpose of medication management for her adult ADHD. This appointment was with a different doctor – Nancy Navarro-Gonzalez, M.D.

16. At the April 20, 2015 appointment, Ms. Bertrand reported to Dr. Navarro-Gonzalez that she was "feeling good". Dr. Navarro-Gonzalez documented that Ms. Bertrand's mood was euthymic, meaning that she had a normal mood in which the range of emotions is neither depressed nor highly elevated.

17. During the April 20, 2015 appointment, Dr. Navarro-Gonzalez confirmed Ms. Bertrand's diagnosis for adult ADHD, and increased the dosage of Ms. Bertrand's Adderall XR prescription to 30 mg per day. There was no evaluation for, or diagnosis of, Bipolar Disorder for Ms. Bertrand by Dr. Navarro-Gonzalez at this appointment.

18. On June 2, 2015, Ms. Bertrand presented to BHCC for an appointment with Dr. Navarro-Gonzalez for the purpose of medication management for her adult ADHD.

19. During the June 2, 2015 appointment, Ms. Bertrand told Dr. Navarro-Gonzalez that she was "feeling okay". Dr. Navarro-Gonzalez performed a physical exam and noted, again, that Ms. Bertrand's mood was euthymic, and also that Ms. Bertrand was oriented, aware and had an appropriate effect.

20. During the June 2, 2015 appointment, Dr. Navarro-Gonzalez did not perform an evaluation of Ms. Bertrand for Bipolar Disorder, did not diagnose Ms. Bertrand with Bipolar Disorder, and continued to diagnose Ms. Bertrand with adult ADHD.

21. Nonetheless, during the June 2, 2015 appointment, Dr. Navarro-Gonzalez prescribed Lamictal® (lamotrigine) for Ms. Bertrand, which is a medication recommended solely for the treatment of either Bipolar Disorder or

Epilepsy. Ms. Bertrand did not have a diagnosis of either Bipolar Disorder or Epilepsy at the time of the prescription for Lamictal® (lamotrigine).

22. Dr. Navarro-Gonzalez prescribed Lamictal® (lamotrigine) for Ms. Bertrand at a starting dose of 150 mg daily.

23. The FDA approved manufacturer recommendation for the starting dose of Lamictal® (lamotrigine), for a patient like Ms. Bertrand, who was not concomitantly taking Carbamazepine, Phenobarbital, Phenytoin, Primidone or Valproate, was 25 mg daily, as demonstrated by the following chart in the manufacturers' package insert:

Table 5. Escalation Regimen for LAMICTAL in Adults with Bipolar Disorder

| | In Patients TAKING Valproate[a] | In Patients NOT TAKING Carbamazepine, Phenytoin, Phenobarbital, Primidone,[b] or Valproate[a] | In Patients TAKING Carbamazepine, Phenytoin, Phenobarbital, or Primidone[b] and NOT TAKING Valproate[a] |
|---|---|---|---|
| Weeks 1 and 2 | 25 mg every other day | 25 mg daily | 50 mg daily |
| Weeks 3 and 4 | 25 mg daily | 50 mg daily | 100 mg daily, in divided doses |
| Week 5 | 50 mg daily | 100 mg daily | 200 mg daily, in divided doses |
| Week 6 | 100 mg daily | 200 mg daily | 300 mg daily, in divided doses |
| Week 7 | 100 mg daily | 200 mg daily | up to 400 mg daily, in divided doses |

24. Dr. Navarro-Gonzalez prescribed Lamictal® (lamotrigine) for Ms. Bertrand at 150 mg, which is 6 times higher than the FDA approved manufacturers'

recommended starting dosage.

25. Lamictal® (lamotrigine) contains a black-box warning, which is the highest level of warning authorized by the FDA, that warns prescribing health care providers as follows:

> **WARNING: SERIOUS SKIN RASHES**
> *See full prescribing information for complete boxed warning.*
>
> - Cases of life-threatening serious rashes, including Stevens-Johnson syndrome and toxic epidermal necrolysis, and/or rash-related death have been caused by lamotrigine. The rate of serious rash is greater in pediatric patients than in adults. Additional factors that may increase the risk of rash include:
>   - coadministration with valproate.
>   - exceeding recommended initial dose of LAMICTAL.
>   - exceeding recommended dose escalation for LAMICTAL. (5.1)
> - Benign rashes are also caused by lamotrigine; however, it is not possible to predict which rashes will prove to be serious or life threatening. LAMICTAL should be discontinued at the first sign of rash, unless the rash is clearly not drug related. (5.1)

26. The Lamictal® (lamotrigine) black-box warning specifically states that "cases of life-threatening serious rashes, including Stevens-Johnson syndrome and toxic epidermal necrolysis, and/or rash-related death have been caused by lamotrigine."

27. The Lamictal® (lamotrigine) black-box warning specifically states that "additional factors that may increase the risk of rash include ... exceeding the recommended initial dose of LAMICTAL".

28. The Lamictal® (lamotrigine) black-box warning specifically states that "benign rashes are also caused by lamotrigine; however, it is not possible to predict

which rashes will prove to be serious or life threatening. LAMICTAL should be discontinued at the first sign of rash, unless the rash is clearly not drug related".

29. Dr. Navarro-Gonzalez did not counsel or warn Ms. Bertrand regarding the risks associated with Lamictal® (lamotrigine) and Stevens-Johnson Syndrome ("SJS") and Toxic Epidermal Necrolysis ("TEN").

30. Dr. Navarro-Gonzalez did not counsel or warn Ms. Bertrand regarding the content of the black-box warning on Lamictal® (lamotrigine) and SJS/TEN.

31. Dr. Navarro-Gonzalez did not counsel or warn Ms. Bertrand that she should stop taking Lamictal® (lamotrigine) at the first sign of rash.

32. Dr. Navarro-Gonzalez did not counsel or warn Ms. Bertrand that she was starting Lamictal® (lamotrigine) at a dose 6 times higher than the recommended starting dosage, which would increase the likelihood of a potentially life-threatening rash.

33. On or around June 8, 2015, Ms. Bertrand was dispensed 30 tablets of 150 mg Lamictal® (lamotrigine) by her pharmacist, with instructions for her to take one tablet daily by mouth. Ms. Bertrand took the medication as instructed.

34. On June 21, 2015, approximately 13 days after her first dose of Lamictal® (lamotrigine), Ms. Bertrand developed neck pain and had difficulty swallowing. She was transferred by ambulance to North Shore Hospital in Miami,

Florida. Ms. Bertrand was discharged from North Shore Hospital with a diagnosis of enlarged lymph nodes.

35. Over the course of the following day, Ms. Bertrand's condition worsened and her skin began to break out into an itchy rash. She presented again to North Shore Hospital on June 22, 2015, where she was evaluated, instructed to discontinue her Lamictal® (lamotrigine), and Dr. Navarro-Gonzalez was contacted regarding a change in the medication. Ms. Bertrand was discharged home with instructions to follow-up with a dermatologist.

36. Unfortunately, Ms. Bertrand's condition did not improve, and on June 23, 2015, Ms. Bertrand presented to Jackson Health System, where she was noted to have a generalized rash on the body, lips, vagina, and mouth, including oral lesions and a burning sensation on the eyelids.

37. Ms. Bertrand was hospitalized at Jackson Health System from June 23, 2015 until July 20, 2015, with a diagnosis of SJS/TEN secondary to Lamictal® (lamotrigine).

38. During her hospitalization, Ms. Bertrand was subjected to intense and painful medical treatment, including the following: PICC line for intravenous medication; Foley catheter; suctioning of the lips and mouth; a Nasogastric (NG) feeding tube for three weeks; peeling the membranes of her eyes, insertion of an

amniotic membrane ring over her cornea; as well as numerous other procedures associated with her lengthy hospitalization.

39. During her hospitalization, Ms. Bertrand was diagnosed with numerous painful symptoms and sequelae of SJS/TEN including: burning of the skin surrounding the urethra when urinating; ocular cicatrizing conjunctivitis in both eyes; extensive irritation of the vaginal mucosa; severe oral mucositis with ongoing secretion and bleeding from the mouth; extreme skin sloughing (skin separating from body) throughout the body; perivascular inflammation; as well as numerous other conditions associated with her lengthy hospitalization and SJS/TEN.

40. During her nearly month-long hospitalization, Ms. Bertrand was separated from her five year-old daughter. Because she was unable to care for her while hospitalized, Ms. Bertrand's daughter was taken to be with Ms. Bertrand's immediate family in Douglasville, Georgia where she could be cared for and attend school. Soon after her hospitalization and discharge, Ms. Bertrand moved to Georgia to prevent any disruption to her daughter's school schedule. Ms. Bertrand continues to live in Douglasville, Georgia.

41. As a result of her month long hospitalization, Ms. Bertrand lost her job and had to drop out of school due to financial constraints, time away while hospitalized, as well as additional reasons related to her SJS/TEN.

42. Subsequent to her hospitalization, Ms. Bertrand continues to have recurring SJS symptoms, including vaginal irritation, visual acuity problems, constant burning, tearing, and itching of the eyes, eczema papules on the soles of the feet, hyperpigmentation and lesions of the face, neck, back, abdomen, chest and thighs, dental problems due to the SJS/TEN involvement of the mouth, and other continued medical problems  Ms. Bertrand also has a long term risk of hypothyroidism, adhesions to the iris and eyelids, scarring and other long term medical problems.

43. Subsequent to her hospitalization, Ms. Bertrand continued to treat with a dermatologist, dentist, ophthalmologist and OB/GYN, and has been treated in a local emergency room on two occasions for issues related to SJS/TEN.  All of this treatment has occurred near Ms. Bertrand's current home in Douglasville, Georgia.

44. Ms. Bertrand was subjected, unnecessarily, to extreme pain and suffering, extensive medical treatment and medical expenses, loss of enjoyment of life, loss of her employment, loss of her education and other damages related to SJS/TEN which the negligence of the Defendants proximately caused or contributed to.

## MEDICAL NEGLIGENCE OF DEFENDANTS UNITED STATES OF AMERICAN AND BHCC THROUGH ITS EMPLOYEE NANCY NAVARRO-GONZALEZ, M.D.

45. Plaintiff hereby incorporates by reference all of the above allegations as if fully set forth herein.

46. At all times relevant herein, a physician-patient relationship existed between Defendant Nancy Navarro-Gonzalez, M.D. and Vanessa Bertrand.

47. At all times relevant herein, Dr. Navarro-Gonzalez had a duty to act within the standard of professional care, which is that level of care, skill and treatment that, in consideration of all surrounding circumstances, is recognized as acceptable and appropriate by similar and reasonably prudent health care providers, with respect to her care for Vanessa Bertrand.

48. The care of Dr. Navarro-Gonzalez did not meet the standard of care, and therefore she breached her duty as a physician with respect to her care and treatment of Vanessa Bertrand for the following specific reasons:

(a) Prescribing Lamictal® (lamotrigine) to Ms. Bertrand at a starting dose of 150 mg, which is six times higher than the FDA approved manufacturer's recommended starting dosage;

(b) Prescribing Lamictal® (lamotrigine) to Ms. Bertrand without proper evaluation, testing, and analysis as to the risks and benefits of Lamictal®

(lamotrigine), and without a specific diagnosis of Bipolar Disorder or Epilepsy for Ms. Bertrand;

(c)     Failing to counsel or warn Ms. Bertrand regarding the risks associated with Lamictal® (lamotrigine) and SJS/TEN;

(d)     Failing to counsel or warn Ms. Bertrand regarding the content of the black-box warning on Lamictal® (lamotrigine) relating to the risk of SJS/TEN;

(e)     Failing to counsel or warn Ms. Bertrand that she should stop taking Lamictal® (lamotrigine) at the first sign of rash; and

(f)     Failing to counsel or warn Ms. Bertrand that she was starting Lamictal® (lamotrigine) at a dose 6 times higher than the recommended starting dosage, which increased the likelihood of a potentially life-threatening rash.

49.     The injuries and damages sustained by Ms. Bertrand were the direct and proximate consequence of Nancy Navarro-Gonzalez, M.D.'s breaches of the standard of care.

50.     The acts and omissions of Dr. Navarro-Gonzalez, described above, caused Ms. Bertrand to develop SJS/TEN resulting in an extensive hospitalization, painful symptoms and sequelae of SJS/TEN, significant medical expenses, and other damages more fully described above.

51. Specifically, by prescribing Lamictal® (lamotrigine) to Ms. Bertrand despite her not having either Bipolar Disorder or Epilepsy, Dr. Navarro-Gonzalez breached the standard of care and thereby caused Ms. Bertrand to develop SJS/TEN. But for this breach of the standard of care, Ms. Bertrand would likely not have developed SJS/TEN.

52. Additionally, by prescribing Lamictal® (lamotrigine) at far too high of a starting dose, Dr. Navarro-Gonzalez breached the standard of care and thereby caused Ms. Bertrand to develop SJS/TEN. But for this breach of the standard of care, Ms. Bertrand would likely not have developed SJS/TEN.

53. Additionally, by failing to provide Ms. Bertrand with adequate counseling and warnings, Ms. Bertand was unaware of the potential for SJS/TEN, did not make an informed decision whether to take the Lamictal® (lamotrigine), and was unaware that she should be on alert for a rash and stop taking Lamictal® (lamotrigine) at the first sign of rash. Therefore, Dr. Navarro-Gonzalez breached the standard of care by failing to counsel Ms. Bertrand and thereby exacerbated Ms. Bertrand's SJS/TEN symptoms.

54. At all times relevant hereto, Defendant Nancy Navarro-Gonzalez, M.D. was an agent, employee, partner, apparent agent, and/or ostensible agent of Defendant United States of America, through BHCC, and therefore, Defendant

United States of America is vicariously liable for the acts, omissions and conduct of Defendant Nancy Navarro-Gonzalez, M.D.

55. As a result of the foregoing acts and omissions, Vanessa Bertrand has incurred medical, rehabilitative, and related expenses, lost wages, non-economic damages including extreme pain and suffering, and other damages.

## **DEMAND FOR RELIEF SOUGHT**

56. Plaintiff hereby incorporates by reference all of the above allegations as if fully set forth herein.

57. As a result of the individual, combined and concurring acts and omissions of Defendant and its agents/employees as set forth herein above, Defendant caused or contributed to the cause of injuries to Plaintiff for which Plaintiff may recover. Plaintiff seeks all damages available under applicable law, including but not limited to:

a. The medical expenses incurred, both in the past and in the future, by Vanessa Bertrand for all medical treatment necessitated by her SJS/TEN or otherwise necessitated by the negligence of Defendant and Defendant's agents/employees;

b. Compensation for all pain and suffering, past and future, mental and emotional related to her SJS/TEN or otherwise necessitated by the negligence of Defendant and Defendant's agents/employees;

c. Compensation for all lost wages or impairment to her ability to earn a living caused by her SJS/TEN, treatment for her SJS/TEN or otherwise caused by the negligence of Defendant and Defendant's agents/employees.

## **PRAYER FOR RELIEF**

Plaintiff further prays for the following relief from all Defendant:

a. That process issue according to law;

b. That Defendant be served with a copy of this Complaint for Damages, and show cause why the prayers for relief requested herein should not be granted;

c. That Plaintiff be granted a trial in the matter;

d. That the Court enter a judgment against Defendant for all general and compensatory damages allowable to Plaintiff;

e. That the Court enter a judgment against Defendant for all special damages allowable to Plaintiff;

f. That the Court enter a judgment against Defendant for all other relief sought by Plaintiff under the Complaint;

g. That the costs of the action be cast upon Defendant; and

f. That the Court grant Plaintiff such further relief which the Court deems just and appropriate.

Respectfully submitted this 4th day of May, 2017.


                                               */s/ C. Andrew Childers*

                                               C. Andrew Childers
                                               Georgia Bar No. 124398
                                               Neil T. Edwards
                                               Georgia Bar No. 967177

CHILDERS, SCHLUETER & SMITH, LLC
1932 N. Druid Hills Road
Suite 100
Atlanta, GA 30319
(404) 419-9500 – telephone
(404) 419-9501 – facsimile
Email: achilders@cssfirm.com